**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| WILLIAM GAY BROWN, | ) | Case No. 14-14378-BFK |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| MOLOY GUPTA | ) | |
| ANN GUPTA, | ) | Adversary Proceeding |
| | ) | No. 15-01028-BFK |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WILLIAM GAY BROWN, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This matter came before the Court for a trial on the merits on August 31, September 1, 2
and 6, 2016, on the Plaintiffs' Complaint to determine the dischargeability of certain debts
pursuant to 11 U.S.C. §§ 523(a)(2)(A) (false pretenses or actual fraud) and 523(a)(4) (defalcation
while acting in a fiduciary capacity). For the reasons stated below, the Court finds in part for the
Plaintiffs and in part for the Defendant.

**Introduction**

Kingwood is the county seat of Preston County, West Virginia. By all accounts a small,
pleasant but economically challenged town, Kingwood was home to the parents of Dr. Ann
Gupta (formerly Brown), one of the Plaintiffs in this action, and William G. (or Bill) Brown, IV,

1

the Defendant. Dr. Gupta is married to Moloy Gupta, who is also a Plaintiff in this case. Dr.

Gupta's and William Brown's brother, Tom, also figures prominently in this story.[1]

Beginning in 2003, Dr. Gupta and Mr. Gupta agreed to purchase a historic home in

Kingwood known as the Bishop House, with the assistance of Dr. Gupta's brother William

Brown. The parties sharply disagree on the initial intent of the purchase. For instance, Dr. Gupta

testified that she and her husband desired to purchase the Bishop House as a second home for

their retirement. In contrast, William Brown testified that the parties agreed to purchase the

property for rehabilitation into a bed and breakfast and conference center. Notwithstanding this

conflicting testimony, the Bishop House was renovated successfully into a B&B and conference

center.

In addition to the Bishop House, the parties decided to purchase other properties in

Kingwood, though again, they disagree intensely on the purpose and extent of their investments.

One of the buildings, the Wilson Building, was renovated and began to generate positive cash-

flow. Another of the buildings, the Herring Building, was an unmitigated mistake from the start –

the town slated the property for condemnation and substantial sums of money had to be invested

just to stabilize the structure, using Tom Brown as the general contractor. The enormity of the

tasks undertaken eventually overwhelmed the parties. They ran out of money. Dr. Gupta and Mr.

Gupta refused to participate in a proposed refinancing, which precipitated foreclosures on a

number of the buildings.

In February 2008, the Guptas filed a lawsuit against Mr. Brown in the Circuit Court of

Preston County. Although Mr. Brown was represented by counsel throughout most of the

---

[1] Preston County is also the home of the annual Buckwheat Festival, featuring carnival rides, buckwheat cakes and the coronation of Queen Ceres and King Buckwheat.  http://www.buckwheatfest.com/schedule.htm.

lawsuit, his counsel withdrew and he appeared *pro se* at the trial on August 12-14, 2014. The jury rendered a verdict in favor of the Guptas in the amount of $2,356,286.09. Shortly thereafter, Mr. Brown filed for Chapter 7 bankruptcy protection with this Court on November 24, 2014. This adversary proceeding ensued.

## Findings of Fact

The Court, having heard the evidence, makes the following findings of fact:

1.      Dr. Ann Gupta and William G. Brown are brother and sister. Dr. Gupta is married to Moloy Gupta. Dr. Gupta and Mr. Gupta live in California. Dr. Gupta, now retired, was an educator with the California public schools. Mr. Gupta is a soils engineer with a successful engineering practice known as Soils Southwest, Inc.[2]

2.      William G. Brown is an attorney licensed to practice law in the Commonwealth of Virginia and in West Virginia. He has been practicing law for almost 50 years. His law practice involves businesses, trusts and estates. Notably, Mr. Brown previously held a position as a trust officer at a financial institution. He also has represented financial institutions, including Branch Banking & Trust (BB&T), which financed the renovations on some of the buildings, in various commercial transactions.

A. *The 1994 Gupta Family Trust.*

3.      In January 1994, Moloy Gupta and Ann Gupta entered into the Trust Agreement for what has come to be known as the 1994 Gupta Family Trust. Def. Ex. 18.

4.      The 1994 Gupta Family Trust was established for the purpose of investing in residential real estate in California.

---

[2]  For purposes hereof, William G. Brown will be referred to as "Mr. Brown." Mr. Brown and Dr. Gupta's brother Tom Brown will be referred to as Tom Brown.

5.　　　The Taxpayer ID number for the 1994 Gupta Family Trust is **** 0907. Def. Ex. 17.

6.　　　Mr. Brown drafted this Trust and was named as the Trustee. He served in that capacity through May 29, 2009. Pl. Ex. 1.

*B.　The Alleged Creation of the 2002 Gupta Family Retirement Trust.*

7.　　　Dr. Gupta testified that it was her understanding that Mr. Brown was creating a retirement trust for her and Mr. Gupta's benefit, and that it was not her intent to invest in commercial real estate in Kingwood. She and Mr. Gupta referred to this as the "2002 Gupta Family Retirement Trust."[3]

8.　　　There is no written Trust Agreement for a 2002 Gupta Family Retirement Trust.

9.　　　In any event, the Circuit Court of Preston County found that Mr. Brown acted as a Trustee and that he breached his fiduciary duties, findings to which this Court accorded collateral estoppel. *See* Parts R and S, below.

10.　　　Accordingly, whether or not the parties intended to create a 2002 Gupta Family Retirement Trust is not material to the issues to be decided in this adversary proceeding.[4]

---

[3]　In support of their position that they intended to create a Trust to provide for their retirement, the Guptas rely on an e-mail dated from Mr. Brown April 21, 2005. Pl. Ex. 19. This e-mail only discusses investing in a general way and is not helpful in determining the parties' intent. Moreover, it is dated April 21, 2005 – well after the purchase of the Bishop House and all of the other properties discussed below, other than the Bar Building which was purchased in June 2005.

[4]　If Mr. Brown was not acting as the Trustee of a 2002 Gupta Family Retirement Trust, he certainly was acting as a Trustee of the 1994 Gupta Family Trust or the William G. Brown Family Trust discussed below. The difference is immaterial.

  *C.  The Bishop House and the William G. Brown Family Trust.*

11.  In January 2003, William G. Brown as Trustee, drafted and entered into a Trust

Agreement with himself and Ann Gupta as the alleged beneficiaries with a 50% beneficial

interest each. Pl. Ex. 3. This Trust came to be known as the William G. Brown Family Trust.

12.  The purpose of this Trust Agreement was the acquisition and renovation of the

Bishop House, a historic home in Kingwood. *Id.*

13.  The Trust Agreement states that William G. Brown and Dr. Gupta are each 50%

beneficiaries of the Trust. In fact, Mr. Brown was not an intended beneficiary. He testified that

he held his 50% interest in trust for Moloy Gupta, who did not want his name on any of the trust

or real estate documents, in order to shield the asset from potential liability problems in

California.

14.  In his resignation letter, discussed below, Mr. Brown stated: "I will immediately

convey the 50% 'protective interest' that I have held in the trust to you," referring to his nominal

50% interest in the 2003 William G. Brown Family Trust. Pl. Ex. 1.

15.  Although Dr. Gupta's signature appears on this Trust, she did not sign it; Mr.

Brown signed it for her.

16.  The Trust Agreement requires the written direction of the Beneficiaries for the

sale of the Trust's property, any mortgage of such property and other matters of importance to

the Beneficiaries. Pl. Ex. 3 ¶ 4(a).

17.  Mr. Brown also caused to be filed a Memorandum of Trust in the land records in

Preston County. Pl. Ex. 4. The Memorandum of Trust represents that the Trustee has the power

to sell and mortgage Trust property, but does not reference any requirement for the written

consent of the Beneficiaries, which is inconsistent with the foregoing terms of the Trust. *Id.,* § 5.

18.     Prior to the execution of the William G. Brown Family Trust, on September 9,

2002, Mr. Brown had his office transmit a facsimile to Mr. Gupta, requesting information to be

used in opening a bank account for the acquisition of the Bishop House. Pl. Ex. 6. The fax used

the Taxpayer ID number for the 1994 Gupta Family Trust ending in 0907.

19.     On September 13, 2002, Mr. and Dr. Gupta opened an account at the Pacific

Premier Bank with an initial deposit of $400,000.00. Pl. Ex. 7. The Guptas unknowingly used the

Taxpayer ID ending in 0907 to open this account. *Id.* William G. Brown was identified as the

authorized signatory on the account. Pl. Ex. 10.

20.     The Bishop House is located at 121 E. High Street in Kingwood. Pl. Ex. 85.

21.     The Deed for the Bishop House from Kingwood Main Street Program, Inc., as

Grantor, to The William G. Brown Family Trust, as Grantee, was recorded in the land records of

Preston County on February 3, 2003. Pl. Ex. 20.  The Deed is dated as of February 3, 2002, but

the parties agree that this is a typographical error – it should have read February 3, 2003. Further,

although the Deed recites that the consideration for the purchase was $92,000.00, Mr. Brown

testified that the purchase price was $145,000.00.

22.     On December 1, 2003, Mr. Brown as Trustee granted BB&T a Deed of Trust and

Security Agreement on the Bishop House to secure a $500,000.00 loan. Pl. Ex. 25 ("the

$500,000.00 Loan").

23.     Mr. Brown did not have Dr. Gupta's or Mr. Gupta's written permission to

encumber the Bishop House, as required by Section 4(a) of the William G. Brown Family Trust

Agreement.

6

24.     Some of the funds from the $500,000.00 Loan were used for renovations at the

Bishop House; some of the funds were used for renovation of the Dunn-Evick Buildings,

discussed below.

25.     Mr. Brown caused to be formed the Bishop House Inn & Conference Center,

LLC, effective April 29, 2004, (the "Bishop House, LLC") as the operating arm of the Bishop

House. Pl. Ex. 57. The Articles of Organization named Mr. Brown as the Manager of this entity.

*Id.*[5]

26.     The parties disagree sharply on the purpose for which the Bishop House was

acquired. Mr. Brown testified that the parties intended from the outset to renovate the property

for use as a bed and breakfast and conference center. Dr. Gupta, on the other hand, testified

forcefully that she never wanted to turn the property into a B&B; she only wanted a second home

in West Virginia for her retirement.

27.     It was clear to Dr. Gupta as of her visit to the Bishop House for Thanksgiving in

2005, however, that the property was being renovated for use as a B&B and conference center,

and that four new apartments were being constructed in the rear of the property to support the

conference center use of the property.

28.     Dr. Gupta did not protest that the renovation of the property was inconsistent with

her desires; rather, she accepted the renovation into a B&B and conference center as a *fait

accompli.*

---

[5] Mr. Brown also caused to be formed another entity known as Bishop House Mill Works, LLC, which was set up
to operate the woodworking shop located on the Bishop House property. Pl. Ex. 59.

29.    Although the property was titled in the name of the William G. Brown Family Trust, tax returns for 2004-2007 were filed in the name of Bishop House, LLC, which identified Dr. Gupta as the sole member. Pl. Exs. 73-76.

30.    The renovations on the main house were completed in February 2004. The remainder of the property was completed in early 2005.

*D.  The Herring Building.*

31.    The Herring Building is located at 109 S. Price Street in Kingwood. Pl. Ex. 88. It is a three-story commercial building constructed around 1914. *Id*., p. 16. It has retail space on the ground floor and office space in the upper two floors. *Id*.

32.    Herring Building, LLC, was formed on January 12, 2004. Pl. Ex. 56. The Articles of Organization filed with the West Virginia State Corporation Commission identified Mr. Brown as the Manager of this entity. *Id.*

33.    The Deed for the Herring Building from Mr. and Ms. Bernatowicz to Herring Building, LLC, was recorded in the land records of Preston County on January 30, 2004. Pl. Ex. 21.

34.    The Bernatowiczes took back a Purchase Money Deed of Trust in the principal amount of $85,000.00. Pl. Ex. 26.

35.    Dr. Gupta is listed as the sole member of Herring Building, LLC, in the Herring Building, LLC, tax returns for the years 2004, 2005, 2006 and 2007. Pl. Exs. 61-64.[6]

---

[6]  Dr. Gupta is listed as the 100% member in the 2004 tax return, and is thereafter listed as a 50% member. The latter is a typographical error, as Dr. Gupta is allocated 100% of the losses in each of the returns.

*E. The Wilson Building.*

36.     Wilson Building, LLC was formed on April 29, 2004. Pl. Ex. 55. The Articles of

Organization filed with the West Virginia State Corporation Commission identified Mr. Brown

as the Manager of this entity. *Id.*

37.     The Operating Agreement lists Mr. Brown as the sole member. *Id.*, p. 12.

38.     The Deed for the Wilson Building from DS Legacy Properties, WV, LLC to

Wilson Building, LLC, as Grantee, was recorded in the land records of Preston County on April

23, 2004. Pl. Ex. 22.

39.     Mr. Brown's accounting shows a transfer in the amount of $141,456.93 for the

purchase of the Wilson Building on April 17, 2004. Def. Ex. 14, p. 20.

40.     Shortly thereafter, Wilson Building, LLC, granted BB&T a Credit Line Deed of

Trust and Security Agreement dated July 30, 2004, in the amount of $150,000.00, and an

Assignment of Leases and Rents. Pl. Ex. 27, 29.

41.     The $150,000.00 was used for renovations in the Wilson Building, including the

addition of air conditioning, replacing the windows and a new furnace in the basement.

42.     In 2006, as discussed below, Mr. Brown applied for and obtained a loan from

BB&T in the amount of $450,000.00, which was secured by a first Deed of Trust on the Dunn-

Evick Buildings and a third Deed of Trust on the Wilson Building. Pl. Ex. 34, 35.

43.     In the Wilson Building, LLC, tax returns, Dr. Gupta is listed as having an 80%

membership interest and Mr. Brown is listed as having a 20% membership interest. Pl. Ex. 69-

72.

44.     Despite a host of problems with non-paying tenants, the Wilson Building cash-flowed positively, with roughly $36,000.00 in positive cash flow per year.[7]

*F.   The Dunn-Evick Buildings.*

45.     The Dunn Building is located on Price Street in Kingwood. It was built in the late 1920's. Pl. Ex. 86, p. 16. It contains approximately 3,361 square feet. *Id.*

46.     The Evick Building also is located on Price Street. Like the Dunn Building, it was built in the 1920's. It contains roughly 2,160 square feet of space. Pl. Ex. 87, p. 16.

47.     Dunn-Evick Buildings, LLC, was organized on April 29, 2004. Pl. Ex. 58. Mr. Brown is named as the Manager in the Articles of Organization. *Id.*

48.     The Deed for the Dunn-Evick Buildings from Kingwood Main Street Program, Inc., to Dunn-Evick Buildings, LLC, as Grantee, was recorded in the land records of Preston County on March 4, 2005. Pl. Ex. 23.

49.     Dr. Gupta is listed as the sole member in the Dunn-Evick Building, LLC's tax returns for 2004, 2005, 2006 and 2007. Pl. Ex. 65-68.

*G.   The May 2006 Cross-Collateralization.*

50.     On or about May 15, 2006, Mr. Brown entered into a Term Loan commitment letter with BB&T, the effect of which was to term out and to cross-collateralize the Wilson Building and the Dunn-Evick Buildings loans. Pl. Ex. 33 ("the $450,000.00 Refinance Loan").

51.     The principal amount of the consolidated loan was $450,000.00. *Id.*

52.     This loan was the subject of a Deed of Trust and Security Agreement from Dunn-Evick Buildings, LLC, recorded in the land records of Preston County on July 17, 2006, and a

---

[7] The Wilson Building, LLC tax returns for years 2004-2007 comport to this figure, reflecting an average gross income of approximately $39,000 per year.  *See* Pl. Exs. 69-72, Line 8.

Deed of Trust and Security Agreement from Wilson Building, LLC, also recorded on July 17,

2006. Pl. Exs. 34, 35.

> *H.  The Bar Building (Bishop Block, LLC).*

53.     The Bar Building is located at 119 S. Price Street, in Kingwood. Pl. Ex. 60.

54.     Bishop Block, LLC, initially consisted of Mr. Brown with a 50% interest, and A.

Craig Rotruck and James G. Lobb with 25% interests each. Pl. Ex. 31, 41, 60, 77.

55.     The Deed for the Bar Building from William H. Boone to Bishop Block, LLC, as

Grantee, was recorded in the land records of Preston County on June 24, 2005. Pl. Ex. 24.

56.     On or about August 4, 2006, Mr. Brown, on behalf of Bishop Block, LLC,

executed a Promissory Note in favor of BB&T in the principal amount of $214,000.00. Pl. Ex.

40.

57.     Mr. Brown personally guaranteed the loan. Pl. Ex. 42.

58.     In connection with the $214,000.00 loan, Bishop Block, LLC, granted a Credit

Line Deed of Trust and Security Agreement in favor of BB&T. Pl. Ex. 39.

59.     Shortly thereafter, in September 2006, Mr. Brown, on behalf of Bishop Block,

LLC, borrowed an additional $20,000.00 from BB&T secured by a second lien Credit Line Deed

of Trust and Security Agreement. Pl. Ex. 44, 45.

60.     Mr. Brown, acting for Bishop Block, LLC, entered into Note Modification

Agreements with BB&T for the $214,000 loan and the $20,000 loan in March 2007, and again in

October 2007. Pl. Ex. 46, 47, 48, 49.  Furthermore, in July 2008, Mr Brown, on behalf of Bishop

Block, LLC, entered into a Forbearance Agreement covering both loans. Pl. Ex. 50.

61.     In connection with the October 2007 refinance, Mr. Rotruck and Mr. Lobb deeded their interests in Bishop Block, LLC, to Mr. Brown, in exchange for which they were released from their personal guaranties with BB&T. Pl. Ex. 53.

*I.  Sweet Annie's Ice Cream Shop.*

62.     As though the renovations of all of the above properties were not enough to deal with (including the nearly collapsing Herring Building), Mr. Brown and Dr. Gupta opened an ice cream store in one of the Dunn-Evick Buildings known as Sweet Annie's.

63.     Dr. Gupta actively participated in the operations of Sweet Annie's. She maintained an apartment in the same building, above the store.

*J.  The $150,000.00 from Family Fidelity Holdings.*

64.     Mr. and Dr. Gupta (or Soils Southwest) had loaned money to an individual named Ivano Stamegna and his company, Fidelity Family Holdings, LP. *See* Pl. Ex. 14.

65.     It isn't clear how Mr. Brown came to know of the loan, but on April 13, 2006, he faxed a payoff statement and wiring instructions to Fidelity Family Holdings. *Id.*

66.     On April 14, 2006, Fidelity Family Holdings wired the sum of $531,725.99 to Mr. Brown as Trustee. Pl. Ex. 15.

67.     Mr. Brown then wrote a check payable to Mr. Gupta, but he "borrowed $150,000.00 for Kingwood," which he stated he would "pay back upon the refinance which has been approved and the paperwork is being processed." Pl. Ex. 16.

*K.  The Plaintiffs' Tax Returns.*

68.     Dr. and Mr. Gupta's 2004 individual tax return claims tax losses associated with Dunn-Evick Buildings, LLC, Bishop House, LLC, Sweet Annies, LLC, Wilson Building, LLC, and Herring Building, LLC, totaling $464,911.00. Def. Ex. 4 (Schedule E, Statement 1).

69.     The Guptas' individual tax return for 2005 shows $150,647.00 in claimed losses arising from the same business entities. Def. Ex. 5 (Schedule E, Statement 2).

70.     The IRS Wage and Income Transcript for the Guptas for 2006 shows losses associated with Herring Building, LLC, Wilson Building, LLC, Bishop House, LLC and Dunn-Evick Buildings, LLC, totaling $85,810.00. Def. Ex. 6.

71.     Similarly, the Guptas' 2007 Wage and Income Transcript shows losses associated Herring Building, LLC, Wilson Building, LLC, Bishop House, LLC, Dunn-Evick Buildings, LLC, and Bishop Block, LLC, totaling $257,648.00. Def. Ex. 7.

72.     The Guptas' 2008 individual tax return lists Wilson Building, LLC, Bishop Block, LLC, and Bishop House, LLC on Schedule E. Def. Ex. 8.

73.     The Guptas' tax return for 2009 (which they signed individually) shows losses associated with "Kingwood BishopHouse" and "Kingwood Heritage," the latter being a reference to the Herring Building. Def. Ex. 9. The return also shows losses associated with "Wilson," "Herring," "Dunn Evick Top Apartments," "Dunn Evick Bottom Apartments," and "Sweet Ann's." *Id.*

74.     The Guptas' 2004 and 2005 tax returns were prepared by Sylvia Foster of California Tax Service, whom Mr. and Dr. Gupta hired to prepare the returns. *See* Def. Exs. 4,5.

75.     The Guptas testified that Mr. Brown met with Ms. Foster and that effectively he was the author of the returns. The Court finds, however, that while Mr. Brown did meet with Sylvia Foster in order to assist in the preparation of the tax returns, the returns were prepared by Ms. Foster and the Guptas authorized her to file the returns.

13

76.     The Guptas' individual tax return for 2008 was prepared by Sylvia Saunders of JNS Accounting and Tax in Redlands, CA, whom Mr. and Dr. Gupta engaged to prepare the return. Def. Ex. 8.

77.     The Guptas' 2009 individual tax return was prepared by California Payday Advance, also at the direction of the Guptas. Def. Ex. 9.

78.     The Guptas both testified that they have been audited by the IRS. They testified that they have been advised that it is too late to amend the returns for the tax years 2009 and before.[8]

*L.   Mr. Brown Resigns as Trustee.*

79.     On May 29, 2009, Mr. Brown resigned as Trustee. Pl. Ex. 1.

80.     At the time of his resignation, he forwarded to Mr. and Dr. Gupta loan statements for the various loans indicating the following principal balances:

Bishop House        $423,488.54[9]

Bishop Block        $207,377.54

Bishop Block        $19,317.32

*Id.*

---

[8]   Defendant's Exhibit 3, which was admitted as a summary of the Plaintiffs' tax returns, summarizes the amounts that the Guptas took as deductions on their tax returns for the various Kingwood properties for the years 2004 through 2012. *See* Def. Ex. 3. The Court notes that there appears to be a mathematical error in calculating the losses for the 2006 tax year, which shows a total loss of $87,163.00. The total loss for 2006 should be $84,457.00, which is attributable to a gain by the Wilson Building, LLC of $1,353.00, not a loss. Thus, the $1,353.00 figure should be added, not subtracted, when calculating the total losses of the LLCs for 2006.

[9]   A second statement indicates a loan balance of $407,395.11. Pl Ex. 1. The difference, while not insignificant, is immaterial for purposes of this decision.

*M. The Plaintiffs' Claimed Damages.*

81.     The parties agree that Mr. and Dr. Gupta transferred a total of $1,715,358.31 to

Mr. Brown from December 2003 through July 2007. Def. Ex. 1.

82.     Mr. and Dr. Gupta also claim that they are owed $411,937.28 for a loan on the

Bishop House that they were required to pay off in order to save the property from foreclosure.

*Id.*

83.     Mr. and Dr. Gupta also claim $228,990.50 in legal fees for the West Virginia

litigation described below.[10]

*N. The Plaintiffs' Valuation of the Buildings.*

84.     The Plaintiffs presented the testimony of Joseph Chico as an expert witness on the

value of the buildings. Mr. Chico was qualified as an expert, and the Court accepted his

testimony.

85.     Mr. Chico testified that, in his opinion, the following properties had fair market

values as indicated:

| | |
|---|---|
| Bishop House | $600,000.00 as of June 1, 2009 |
| Dunn Building | $100,000.00 as of June 1, 2009 |
| Evick Building | $76,500.00 as of June 1, 2009 |
| Herring Building | $115,000.00 as of June 1, 2009 |

Pl. Exs. 85, 86, 87 and 88.

---

[10]  At the trial, Mr. Brown's counsel made the point that much, if not all, of the funds transferred to Mr. Brown came from Mr. Gupta's company, Soils Southwest, Inc. Dr. Gupta and Mr. Gupta testified that Soils Southwest is an "S" corporation, so that the company's money is in effect their money. Regardless of the effect of the "S" corporation, the jury in Preston County awarded damages in the amount specified and this was reduced to a final, non-appealable judgment. The time to raise any defense related to the Plaintiffs' standing (as opposed to Soil Southwest's standing as the real party in interest) was at the trial in Preston County, not in this Court.

86.     Mr. Brown did not introduce any appraisal testimony as to the value of the

buildings.

O. *The Accounting Experts.*

(i) *The Plaintiff's Accounting Expert.*

87.     The Plaintiffs presented Mark Kuntz as an accounting expert. He was qualified as

an expert in accounting and tax preparation, but he was not qualified as an expert in fiduciary

matters because he is not a licensed CPA in Virginia and has never served as a trustee in

Virginia. Overall, Mr. Kuntz's testimony was organized and credible.

88.     Mr. Kuntz testified that he reviewed the various bank statements, canceled checks

and the tax returns for the various entities.

89.     Mr. Kuntz faulted Mr. Brown's accounting (Def. Ex. 13). First, Mr. Kuntz

testified that because there were substantial improvements to the properties, the properties should

have been reported as long term assets and depreciated.

90.     Mr. Kuntz also criticized the fact that the entities were reported on Mr. Brown's

Balance Sheet on a consolidated basis. He testified that there should be one profit and loss (P&L)

statement for each entity for each year. He described Mr. Brown's accounting as "inaccurate"

and "incomplete." He noted that the accounting did not conform to generally accepted

accounting principles (GAAP) (though, none of the business entities were publicly traded and

GAAP accounting may not have been necessary).

91.     In reviewing the various tax returns for the entities (which were prepared either

by Mr. Brown or with his assistance), Mr. Kuntz testified that: (a) all of the entities, with the

exception perhaps of Bishop House, should have been reported as passive income; (b) for the

Herring Building, which reported a negative capital account for the members (Pl. Ex. 61), it is

impossible to have a negative capital account where the asset has a positive value;[11] (c) Bishop

House, LLC's partnership return for 2005 (Pl. Ex. 74) took deductions for depreciation, whereas

the property was owned by the William G. Brown Family Trust, not Bishop House, LLC.

92.     When asked on cross-examination whether he could identify any instances where

Mr. Brown used any of the assets for his own personal benefit, Mr. Kuntz only identified Mr.

Brown's purchase of a Volkswagen, which he used to travel to and from Kingwood on the

weekends.

*(ii) The Defendant's Accounting and Accounting Expert.*

93.     The Defendant presented the testimony of Ravi Bhatia, a Virginia C.P.A. Mr.

Bhatia testified that he assisted Mr. Brown in putting together Defendant's Exhibit 14, a

Quickbooks summary of the expenditures on the Kingwood project. He also helped prepare

Defendant's Exhibit 13, the Balance Sheet for the project.

94.     Mr. Bhatia's testimony was less than convincing. On cross-examination, he

testified that he spent "probably 5 to 6 hours" in the preparation of the Quickbooks summary

(Def. Ex. 14), though he stated that his staff spent additional time preparing the summary. He did

not perform an audit of the project. He conceded that the Quickbooks summary did not detail all

of the transactions.

95.     Mr. Brown claims that he personally invested $466,441.00 in the Kingwood

project, though it is not clear to the Court just how he arrived at this number.

---

[11]   This is also true for the Dunn-Evick Buildings, for which the 2006 tax return shows negative capital accounts,
and a positive balance sheet. Pl. Ex. 67.

*P.   Tom Brown's Testimony.*

96.      Tom Brown is Dr. Gupta's and William Brown's brother. He holds a general

contractor's license, a master electrician's license, a plumbing license and an HVAC license, all

in the State of West Virginia.

97.      Tom Brown moved to Kingwood in late 2005 or early 2006, to assist with the

rehabilitation of the properties. He was asked specifically to supervise the renovation of the

Herring Building (which the parties also referred to as the Corner Building).

98.      As soon as he inspected the Herring Building, he recognized the need to stabilize

the structure. He testified that he discussed the cost with William Brown. He stated that he was

willing take the job on a cost-plus basis. The job required scaffolding and other, heavier

equipment. He estimated that the stabilization process would take approximately 90 days.

99.      In addition to stabilizing the structure, Mr. Brown recognized as soon as he

inspected the roof that the trusses for the roof were collapsing, and they had to be replaced. In the

meantime, the roof had to be supported with jacks that went down to the concrete floor in the

basement (for a three-story structure).

100.      Tom Brown testified that he was spending approximately $4,000 to $5,000 per

week on labor and equipment costs for the Herring Building.

101.      Tom Brown testified that he kept both his brother William and his sister, Dr.

Gupta, informed of his progress and costs. He testified that at Thanksgiving in 2005, the family

got together in Kingwood, and that they all walked the town and inspected the various buildings

together.

102.      With respect to the Wilson Building, Tom Brown testified that it was his

understanding that Dr. Gupta and her husband owned this building. He testified that he put in

18

new windows, a new air conditioning system, all with the knowledge and consent of Dr. Gupta and Moloy Gupta.

103.    Tom Brown expressed great frustration on two fronts. First, he described Dr. Gupta and Moloy Gupta as absentee owners who relied on staff who were not honest and were costing the Brown family a great deal of money. For example, he described the manager of the Bishop House, Claudia Atkinson, as ordering food for her own, unaffiliated restaurant, at the expense of the Bishop House. Second, he testified that Dr. Gupta and Mr. Gupta allowed parties to occupy space in the Wilson Building without paying rent. Tom Brown estimated that at one point as much as one-third of the tenants in the Wilson Building were not paying rent.

104.    By April 2006, after Tom Brown had been working on the various buildings for more than a year without any payment, he demanded some form of compensation. He testified that he told Dr. Gupta and Mr. Gupta that they needed to refinance the properties, but they resisted the notion of borrowing any money, responding that they always paid cash and tried to live their lives in a debt-free manner.

105.    By Thanksgiving of 2006, Tom Brown advised his sister and Mr. Gupta that a refinance of the properties was absolutely necessary. He testified that, again, Dr. Gupta and Moloy Gupta advised him that they would not sign any refinance papers.[12]

106.    In December 2006, Dr. Gupta wrote an e-mail to William G. Brown stating:

> Sounds like you have a plan. If it works, you've done really well. If part of it works, you've done really well. If none of it works, you've done well. You re-created that street, and that town.

---

[12]   The Court does not fault Dr. Gupta and Mr. Gupta for their decision not to participate in the refinance of the Kingwood Properties. They were never obligors on any of the loans, and they were entitled to make a business decision not to become personally liable, which would have been required as a part of any refinance. The decision not to participate in the refinance, however, had predictable consequences – the renovation of the Herring Building came to a screeching halt, and the limited liability companies were then faced with the prospect of foreclosures on the properties.

Def. Ex. 15, p. 7.

107.    Of course, by December 2006, there was no plan at all. The Guptas were refusing to pour more money into the properties and were refusing to sign off on a refinance. William G. Brown had had enough and had returned to practice law in Virginia. Tom Brown was fed up, having gone unpaid for the better part of a year.

108.    Tom Brown's testimony was not without serious problems. On cross-examination, Tom Brown acknowledged unambiguously racist and xenophobic statements in his e-mails to Dr. Gupta's and Moloy Gupta's son. Pl. Ex. 96.

109.    Other than the foregoing repugnant statements, however, the Court found Tom Brown's testimony to be helpful in putting together the chronology of events in Kingwood.

*Q. The Lawsuit in Preston County.*

110.    In February 2008, Mr. and Dr. Gupta filed a lawsuit against Mr. Brown in the Circuit Court of Preston County, West Virginia.

111.    Mr. Brown was represented by counsel for most of the State court action. However, his counsel withdrew prior to the trial.

112.    The trial was held on August 12, 13, and 14, 2014. The jury awarded Mr. and Dr. Gupta $2,356,286.09 in damages, which was reduced to a judgment by the Circuit Court. Pl. Exs. 94, 95.[13]

---

[13]   In his opening statement, counsel for the Plaintiffs stated that the Preston County judgment included roughly $379,000 in oil and gas royalties which apparently were left to the Brown family by their parents. The Court did not hear any evidence with respect to these royalties, other than Dr. Gupta's response to the question whether she authorized Mr. Brown to use her share of the oil and gas money ("Absolutely not"). No royalty account histories, payments or transfers were entered into evidence during the trial.

*R.   The Defendant Files for Bankruptcy.*

113.    Mr. Brown filed a voluntary petition under Chapter 7 in this Court on November 24, 2014. Case No. 14-14378-BFK, Docket No. 1.

114.    Mr. and Dr. Gupta timely filed their Complaint to determine the dischargeability of the debt owed to them on February 9, 2015. Adv. Proc. No. 15-01028-BFK, Docket No. 1.

115.    The Court heard the evidence on August 31, September 1, 2, and 6, 2016, at the conclusion of which the Court took the matter under advisement.

*S.   The Court's Ruling on Summary Judgment.*

116.    On September 15, 2015, the Court granted in part and denied in part the Plaintiffs' Motion for Summary Judgment. Adv. Proc. No. 15-01028-BFK, Docket No. 56. Specifically, the Court held that with respect to Count I under Section 523(a)(2)(A), the following facts were established by collateral estoppel: (a) the Defendant made fraudulent misrepresentations to the Plaintiffs; (b) the Plaintiffs justifiably relied on the Defendant's fraudulent misrepresentations; (c) the Plaintiffs were damaged as a result of the Defendant's breaches of fiduciary duties; and (d) the amount of the damages suffered by the Plaintiffs was $2,356,286.09. *Id.*, p. 7.  The remaining issue under Count I was how much, if any, of the Plaintiffs' damages were caused by the Defendant's non-dischargeable conduct under Section 523(a)(2)(A) of the Code.

117.    With respect to Count II, under Section 523(a)(4) of the Code, the Court held the following facts to be established by collateral estoppel: (a) the Defendant acted as a fiduciary with respect to the Plaintiffs; (b) the Defendant breached his fiduciary duties to the Plaintiffs; (c) the Plaintiffs were damaged as a result of the Defendant's breaches of fiduciary duties; and (d) the amount of the damages suffered by the Plaintiffs was $2,356,286.09.

118.     The remaining issues under Count II were: (a) whether the Defendant's actions in breaching his fiduciary duties rose to the level of culpability required by the *Bullock* decision; and (b) how much, if any, of the Plaintiffs' $2,356,286.09 in damages was caused by the Defendant's culpable conduct under *Bullock*.

T.     *The Fallout.*

118.     In the end, the Wilson Building was foreclosed. The Bar Building also was foreclosed. Sweet Annie's is closed.

119.     Dr. and Mr. Gupta still own the Herring Building. They also own the Bishop House, which later was refinanced with BB&T, and the Dunn-Evick Buildings.

## Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference of the U.S. District Court for this District entered August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).[14]

The Plaintiff bears the burden of proof on all of the elements of non-dischargeability under Section 523, by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991); *Kubota Tractor Corp. v. Strack (In re Strack),* 524 F.3d 493, 497 (4th Cir. 2008).[15]

---

[14]   The Complaint in this action included a Count to deny the Debtor his discharge under 11 U.S.C. § 727. The Plaintiffs abandoned the Section 727 Count at trial, and the Court waived compliance with L.R. 7041-1, which requires notice to the creditors and the U.S. Trustee of the dismissal of actions objecting to discharge, including a statement of any consideration paid or to be paid in connection with the dismissal. This Local Rule is intended to prevent the appearance that debtors might be buying discharges. Clearly, in this case, there has been no settlement and there is no consideration being paid for the dismissal of Count III.

[15]   As more fully discussed below, *Strack's* holding, that "'negligence or even an innocent mistake which results in... [the] failure to account is sufficient'" under Section 523(a)(4), *In re Strack*, 524 F.3d 493, 498 n. 7 (4th Cir. 2008) (quoting *Republic of Rwanda v. Uwimana (In re Uwimana),* 274 F.3d 806, 811 (4th Cir. 2001)), is no longer good law in light of the Supreme Court's recent opinion in *Bullock v. BankChampaign, N.A.,* 133 S.Ct. 1754 (2013).

After the summary judgment ruling, the remaining issues in the case are: (a) with respect to Count I under Section 523(a)(2)(A), what damages flowed from the Defendant's fraudulent conduct; and (b) with respect to Count II under Section 523(a)(4), (i) whether the Defendant's conduct comes within the *Bullock* standard described below, and (ii) if so, what are the damages that flowed from the Defendant's violation of the *Bullock* standard. The Court addresses these issues, in turn.

## I.      Count I – Section 523(a)(2)(A).

To prevail on a claim of actual fraud under Section 523(a)(2)(A), the plaintiff "must prove four elements: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the Plaintiff's justifiable reliance on the misrepresentation." *Foley & Lardner v. Biondo (In re Biondo),* 180 F.3d 126, 134 (4th Cir. 1999). The Court has found that collateral estoppel applies and that the Preston County judgment satisfies all of these elements except the element of how much of the Plaintiffs' damages were caused by the Defendant's non-dischargeable conduct. The Fourth Circuit has held that, "[f]or a debt to fall within this exception, money, property or services, or an extension, renewal or refinancing of credit must actually have been *obtained by* the false pretenses or representations or by means of actual fraud." *Nunnery v. Rountree (In re Rountree),* 478 F.3d 215, 219 n.1 (4th Cir. 2007) (citing Collier on Bankruptcy, ¶ 523.08[1][b] (15th ed., rev. 2004)) (emphasis added).

The Defendant's fraudulent conduct has been established by collateral estoppel. Yet, throughout the trial in this case, the Court searched for a connection between the Defendant's fraudulent, non-dischargeable conduct and the damages suffered by the Plaintiffs and awarded by the Preston County Circuit Court. When asked whether Mr. Brown used the Plaintiffs' money

23

for his own benefit, Mr. Gupta could only answer: "Well, I lost my money. I trusted him," or words to that effect. Importantly, the Plaintiffs never identified which of their advances went into which buildings, so it is impossible to tie any particular advance of funds to a specific misrepresentation or fraudulent act.

A.   *The $150,000.00 in Damages.*

The one example that ties a portion of the Plaintiffs' damages to actually fraudulent conduct is the $150,000.00 that William Brown retained from the repayment of the Fidelity Family Holdings loan. Pl. Ex. 14, 15, 16. Dr. and Mr. Gupta both testified that the payment to Mr. Brown was completely unauthorized. They testified that once they learned that Mr. Brown retained $150,000.00 from the payoff they attempted to contact him, but that he would not return their calls. They did not write any letters or e-mails concerning this unauthorized retention of their funds, but this does not amount to a knowing and intentional waiver of their rights. The retention of the $150,000.00 was nothing more than a conversion of their personal funds.

The Court finds that the Plaintiffs have established the necessary connection between the fraudulent conduct found by the jury in West Virginia and the $150,000.00 in damages. The Court will order this portion of the Plaintiffs' damages to be non-dischargeable under Section 523(a)(2)(A) of the Code.

B.   *The Remainder of the Plaintiffs' Claims.*

With respect to the remainder of the Plaintiffs' claims, Dr. Gupta testified that she expected William Brown to invest her and her husband's money in municipal bonds for their retirement. She relied on an e-mail dated April 21, 2005, from William Brown, which discussed municipal bonds. Pl. Ex. 19. The Court, however, discounts this testimony. First, the e-mail discussed municipal bonds in a general way, not in specific terms of investing the substantial

sums that the Dr. Gupta and her husband already had sent to Mr. Brown by April of 2005. *See* Def. Ex. 1 (dates of transfers). Second, throughout the parties' relationship, Dr. Gupta and her husband never received a single account statement for any investments in municipal bonds, and appear never to have asked for one. Third, Dr. Gupta and Moloy Gupta visited Kingwood from time to time and could plainly see that work was being performed on the various buildings. They discussed the work with both Tom Brown and Mr. Brown.

The Plaintiffs assert that the various limited liability companies were "secret LLC's," completely unknown to them until Mr. Brown's resignation letter on May 29, 2009. The Plaintiffs' tax returns, however, convincingly demonstrate otherwise. The Plaintiffs took hundreds of thousands of dollars in tax benefits for the tax years 2004 through 2009. Defendant's Exs. 4 – 9. These were not isolated or obscure entries on the Plaintiffs' tax returns – the deductions were substantial and correspondingly diminished the Plaintiffs' tax liabilities. The Plaintiffs argue that Mr. Brown prepared their tax returns but in the end the Court finds that the Plaintiffs are responsible for the content of their own tax returns. *Cf. United States v. Tucker*, 133 F.3d 1208, 1218 n.11 (9th Cir. 1998) (noting that a signature on a tax return is sufficient to establish knowledge of contents of the return); *see also Johnson v. United States,* 632 F. Supp. 172, 175 (W.D.N.C. 1986) (finding repeated representations to the IRS that the plaintiff-sister was a partner in the business and the taking of substantial deductions on personal income tax return for the share of the losses incurred mandated estoppel from denying participation or intent from participating in the business with her brother); U.S. Dep't of Justice, Criminal Tax Manual, §12.11[2] – Signature on Return as Evidence of Knowledge of Return Contents.[16]

---

[16] The Guptas only signed the 2009 tax return. The Guptas, however, did not contest the authenticity of the tax returns and transcripts for the remaining tax years.

It is true that Mr. Brown made himself a 50% beneficiary of the William G. Brown Family Trust, and that he signed Dr. Gupta's name to the Trust Agreement without her knowledge or authorization. Pl. Ex. 3. The Memorandum of Trust is not consistent with the Trust Agreement in describing the authority of the Trustee. *Compare* Pl. Ex. 3 *with* Pl. Ex. 4. The Plaintiffs have failed, however, to demonstrate how the Defendant benefitted from being named as a 50% beneficiary of the William G. Brown Family Trust. There was no evidence of any distributions from the William G. Brown Family Trust being misdirected to Mr. Brown on account of his purported 50% beneficial interest in the Trust. The William G. Brown Family Trust owned the Bishop House. Dr. Gupta took all of the tax deductions associated with the Bishop House. Dr. Gupta and Moloy Gupta own the completely renovated Bishop House today.

Dr. and Mr. Gupta were absentee investors with respect to all of the properties. They relied on William G. Brown for the renovations at the Bishop House. They relied on Tom Brown for the renovations of the Herring Building. They really had no idea of the costs involved with any of the buildings. They never requested copies of invoices and for the most part they funded the renovations when funds were requested. By Thanksgiving of 2006, the parties ran out of money for further renovations. Dr. and Mr. Gupta declined to participate in a refinance, which as noted was their right, but which also had predictable consequences. The Guptas never signed any of the loan documents associated with the properties, so they had no personal exposure to the lenders. The Plaintiffs presented appraisal testimony on the value of the various buildings that was unchallenged, but in the absence of testimony as to which of the Plaintiffs' advances of funds went into which buildings the appraisal testimony isn't helpful to the Court.

The Court finds that for all of the Plaintiffs' damages other than the $150,000.00 in loan proceeds the Plaintiffs have not met their burden of proof on the final element under Section

26

523(a)(2)(A), that of how much of their damages are attributable to the Defendant's fraudulent

conduct. The Court will declare the Plaintiffs' Judgment to be non-dischargeable with respect to

the $150,000.00 and otherwise will enter judgment for the Defendant on Count I.

**II.      Count II – Section 523(a)(4).**

The case of *Bullock v. BankChampaign, N.A.,* 133 S.Ct. 1754 (2013), changed the law in

the Fourth Circuit, with respect to the proof needed to sustain a claim under Section 523(a)(4).

Previously, "negligence or even an innocent mistake which results in the failure to account" was

sufficient to prove a case under Section 523(a)(4). *See In re Strack*, 524 F.3d at 498 n.7 (quoting

*Republic of Rwanda v. Uwimana (In re Uwimana),* 274 F.3d 806, 811 (4th Cir. 2001)). *Bullock*

raised the standard to that of intentional misconduct, or at least reckless disregard of a known

duty. The Supreme Court held with respect to the term "defalcation:"

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other
> immoral conduct, the term requires an intentional wrong. We include as intentional not
> only conduct that the fiduciary knows is improper but also reckless conduct of the kind
> that the criminal law often treats as the equivalent. Thus, we include reckless conduct of
> the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is
> lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is
> willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to
> violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). See *id*., §
> 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of
> "knowledge" was designed to include " 'willful blindness' "). That risk "must be of such
> a nature and degree that, considering the nature and purpose of the actor's conduct and the
> circumstances known to him, its disregard involves a gross deviation from the standard of
> conduct that a law-abiding person would observe in the actor's situation." Id., §
> 2.02(2)(c), at 226 (emphasis added). Cf. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194,
> n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes
> as "a mental state embracing intent to deceive, manipulate, or defraud").

*Bullock*, 133 S.Ct. at 1759-60.

As noted above, the parties' versions of events vary wildly. Dr. Gupta was firm in her

testimony that she and her husband forwarded the money to Mr. Brown in the hopes of creating a

27

retirement trust. Mr. Brown was equally forceful in his testimony that the whole idea of the

Kingwood project was to bring back the downtown as a tribute to his and his siblings' parents. In

the end, the Court is satisfied that the Preston County Circuit Court found that there was a trust

and that Mr. Brown acted as a fiduciary. This is sufficient to place the matter squarely within

Bankruptcy Code Section 523(a)(4). *See* Order Granting in Part and Denying in Part Plaintiffs'

Motion for Partial Summary Judgment, Adv. Proc. No. 15-01028-BFK, Docket No. 56, pp. 10-

15.

The remaining issues on Count II are: (a) did the Defendant violate the *Bullock* standard;

and (b) if so, what are the damages that flow from the Defendant's *Bullock* violations.

A.   *Did the Defendant Violate the Bullock Standard?*

Before *Bullock*, the Plaintiffs almost certainly would have met the relatively lenient

standard of *Strack* and *Uwimana*. The Defendant's accounting is incomplete, sloppy and

unreliable. If a failure to account were sufficient evidence under Section 523(a)(4), the Court

might well find for the Plaintiffs. Under *Bullock*, however, a failure to account is not sufficient.

There must be more – either self-dealing or the conscious disregard of known risks. The Court

will address the various elements of the Plaintiffs' claims in light of this standard.

(i)   *The Volkswagen.*

In November 2003, Mr. Brown purchased a Volkswagen for $1,500.00 in order to travel

between his home in Middleburg, Virginia, and Kingwood. Def. Ex. 14, 11/24/03 ($1,500.00).

There are additional costs charged for gas and maintenance on this vehicle. *Id*., 09/18/03

($785.48); 01/07/04 ($500.00); 01/31/04 ($500.00); 03/12/04 ($500.00); 03/12/04 ($500.00);

04/09/04 ($758.48); 04/12/04 ($758.48); 08/30/04 ($500.00); 09/08/04 ($500.00); 01/17/05

($1,000.00); 02/03/05 ($392.74); 03/22/05 ($1,000.00); 05/05/05 ($500.00); 06/07/05

28

($1,000.00); 07/11/05 ($1,000.00); 08/12/05 ($500.00); 08/24/05 ($500.00); 10/24/05

($1,000.00); 12/05/05 ($1,000.00); 01/03/06 ($500.00); 04/19/2006 ($1,000.00).[17] These

amounts total **$16,195.18.**

Mr. Brown was not authorized to purchase a vehicle as Trustee. He volunteered to go to

Kingwood. It was his responsibility to secure transportation to and from Kingwood from his

home in Middleburg. The Court finds that the purchase of the Volkswagen and the associated gas

and maintenance expenses collectively are an in the nature of self-dealing, within the *Bullock*

standard.

> (ii)    *Roxanne Hill.*

Mr. Brown testified that Roxanne Hill was a client of his law firm in Middleburg. There

are two deposits of $20,000.00 each from Ms. Hill (Def. Ex. 14, 11/20/03, and 9/18/03), and one

transfer of $40,000.00 back to Ms. Hill on January 7, 2004. *Id.*, 1/7/04. These transactions,

however, appear to negate each other.

Although these transactions raise ethical issues (*See* Va. Rule of Professional Conduct

1.8(a), Conflict of Interest: Prohibited Transactions), there does not appear to be any damage to

the Guptas associated with the transactions. The Court will decline to declare the Debtor's

transactions with Ms. Hill to be non-dischargeable.

> (iii)    *Betty Campbell.*

There is a debit of $50,000.00 dated December 29, 2003, in Mr. Brown's accounting.

Def. Ex. 14. Mr. Brown testified that Ms. Campbell was an elderly woman in Kingwood who

wanted to support the restoration of the downtown and who walked into the bank uninvited and

---

[17]   The fact that there are double entries on the same dates for the same amounts is indicative of the disordered way
in which Mr. Brown kept the books for the Kingwood project.

made a deposit to Mr. Brown's account in this amount. Mr. Brown testified that he felt obligated under the circumstances to repay Ms. Campbell her money. The implausibility of this explanation notwithstanding (how Ms. Campbell knew in which bank Mr. Brown maintained his accounts in Kingwood is unexplained), the difficulty with Mr. Brown's explanation is that there is no corresponding deposit of $50,000.00 from Ms. Campbell in the Defendant's accounting.

Further, although Mr. Brown testified that he was only repaying Ms. Campbell's well-intentioned but misguided deposit, there is an additional payment of $5,000.00 to Ms. Campbell on April 7, 2004, three months and one week after the deposit supposedly was repaid on December 29, 2003. Def. Ex. 14, 4/07/04.

The Court finds these two payments to be inexplicable. They fall well below the standard of any trustee entrusted with funds on behalf of beneficiaries. The Court finds that the two transfers, totaling **$55,000.00**, to be non-dischargeable under Section 523(a)(4) of the Code.

       *(iv)*    *Claudia Atkinson.*

According to all of the parties, Claudia Atkinson engaged in self-dealing by purchasing food supplies for her own establishment at the expense of the Bishop House. The loss was estimated by the Plaintiffs to be in the amount of approximately **$350,000.00.**

In the case of *In re Roberson*, 2014 WL 1876340 (Bankr. E.D. Va. 2014), this Court held that where a fiduciary allowed an employee to embezzle funds over a long period of time, without reconciling the bank statements, the fiduciary's conduct fell below the *Bullock* standard. *Id.*, at * 11 ("It is clear that [the Debtor] improperly delegated the responsibility of reviewing and reconciling the bank statements to [the employee], and that he failed to exercise proper supervision over [the employee].") The losses to Ms. Atkinson are similar in nature to the embezzlement in *Roberson*.

In this case, however, the alleged $350,000.00 in pilferage losses at the Bishop House were *not* part of the damages assessed in the Preston County case and that now form the basis of the Plaintiffs' claims. The primary claims asserted by the Plaintiffs in the Preston County action were the funds – $1.7 million – advanced by the Plaintiffs to the Defendant either for investments in a retirement trust (according to the Plaintiffs) or for investments in commercial real estate (according to the Defendant). Secondarily, the Plaintiffs claimed that the Defendant invaded Dr. Gupta's oil and gas royalty payment stream, and that the Plaintiffs had to refinance the Bishop House. The pilferage claim was not a part of the damages assessed in West Virginia.

In the trial in this action, no evidence was presented of the nature and amount of this claim, other than an estimate from Plaintiffs' counsel of $350,000.00 in lost inventory from the Bishop House. No accounting of the losses was introduced into evidence. The Court finds that the evidence presented was insufficient to hold the Defendant liable under Section 523(a)(4) for the losses of inventory at the Bishop House.

(v)      <i>The Scott & Stringfellow Entries.</i>

The Plaintiffs point to a number of transfers to a Scott and Stringfellow account in the Defendant's accounting. Def. Ex. 14, p. DTX 0025, 12/13/03 ("Scott & String… $50,000"); 7/24/05 ("Scott & Stringfellow, Bishop House, Furniture - $15,000). Both Dr. Gupta and William G. Brown had investment accounts at Scott and Stringfellow. No Scott and Stringfellow account statements were entered into evidence, tying the transfers to Mr. Brown's Scott and Stringfellow account. Although Mr. Brown's testimony on the subject was not strong, indicating that these entries "probably" were for his sister Ann's Scott and Stringfellow account, the Plaintiffs easily could have introduced account statements into evidence for Mr. Brown's Scott

31

and Stringfellow account, if the transfers were in the nature of self-dealing. Thus, the Court is left to guess as to which account these funds were transferred.

The Court finds that the evidence is insufficient to deny Mr. Brown a discharge related to the transfers to the Scott and Stringfellow account.

*(vi)     The Balance of the Plaintiffs' Claims.*

Plaintiffs' counsel alluded to the fact that throughout the parties' relationship William Brown and his wife were building a beach house in Delaware. The suggestion was that a portion of the Plaintiffs' funds were siphoned off for the beach house which, clearly, would have constituted a breach of fiduciary duty. Yet, after years of discovery in the Preston County Circuit Court action and in this adversary proceeding, during which third party subpoenas to banks were available to the Plaintiffs, the Plaintiffs did not identify a single transfer of their funds to an account that supported the Defendant's beach house. The Plaintiffs' suspicions that their funds were diverted to the Defendant's beach house are unsupported by the evidence.

The Plaintiffs also claim that the two secured loans – the $500,000.00 Loan secured by the Bishop House and the $450,000.00 Refinance Loan secured by the Wilson Building and the Dunn-Evick Buildings (as well as the $150,000.00 loan on the Wilson Building that preceded the Refinance Loan) – were unknown to them as beneficiaries and were unauthorized borrowings against trust assets. Again, though, there is no evidence that Mr. Brown siphoned off any of the loan proceeds to his own personal benefit. Further, there is no evidence that the secured loans were taken out in the face of "substantial and unjustifiable risks" under *Bullock*. The money for the renovations to these buildings had to come from somewhere. The Guptas had no idea what the costs involved were and never requested construction budgets on any of the buildings. The

32

Court cannot find that Mr. Brown's taking out secured loans for the renovations of these properties violated the *Bullock* standard.

The Deed of Trust loan on the Bishop House violated the terms of the William G. Brown Family Trust, which required written authorization in order to encumber the property. Mr. Brown signed Dr. Gupta's name to the William G. Brown Family Trust without her authorization. The breaches of the Trust Agreement are clear. Less clear, however, is precisely how William G. Brown engaged in alleged self-dealing, or took risks that were inordinately hazardous.

Further, it is very difficult to believe that the Guptas were unaware that William Brown had acquired the Herring Building in the name of Herring Building, LLC, as they now claim. Their own tax returns plainly indicate that Dr. Gupta was the sole investor in the Herring Building from 2004 forward. *See* Pl. Ex. 61, 62 and 63. While William Brown was undoubtedly involved with the preparation of the tax returns, in the end, the Guptas are responsible for the preparation and filing of their own tax returns. The deductions over the years for all of the buildings, not just the Herring Building, were substantial. The Court rejects the Plaintiffs' attempts to distance themselves from Sylvia Foster. They hired Ms. Foster to prepare their tax returns. While Mr. Brown aided Ms. Foster in the preparation of the returns, the Plaintiffs' ultimately engaged Ms. Foster, not Mr. Brown, to prepare those returns.

Finally, in his closing argument, counsel for the Plaintiffs directed the Court to a $900,000.00 debit entry in the Defendant's accounting, dated 10/27/04. Pl. Ex. 14, p. 44 of 57. There was no explanation of this debit, but the Court notes that it was preceded by a "Deposit" entry in the amount of $1,000,000.00 on 10/21/04. *Id.*, p. 43 of 57. One would think that a $900,000.00 debit – the largest single transaction in the Defendant's entire accounting history – would have been the subject of specific testimony from both sides, yet the Court heard virtually

33

nothing about this transaction. Mr. Brown testified that the two entries were some kind of bank reconciliation, though this explanation is unsatisfying. In the end, the Court finds that the Plaintiffs did not meet their burden of proof to demonstrate that this accounting entry of $900,000.00 falls within the *Bullock* standard and, in any event, the two entries together would have resulted in an ostensibly positive transaction of $100,000.00.

The *Bullock* case has made it much more difficult for beneficiaries of trusts to win cases against fiduciaries under Section 523(a)(4). The Court finds, having heard and considered all of the evidence, that except as stated above the Plaintiffs have failed in their burden of proof to meet the *Bullock* standard.

> B.  *How Much of the Plaintiffs' Damages Flow from the Defendant's Violations of the Bullock Standard?*

The Court turns to the amount of the Plaintiffs' damages that flow from the above violations of the *Bullock* standard. The Court finds that the following amounts constitute damages flowing from the Defendant's violation of the *Bullock* standard:

> (i)     *The Volkswagen.*

The charges relating to the purchase and maintenance of the Volkswagen, totaling **$16,195.18** are directly attributable to the Defendant's violation of the *Bullock* standard and are identifiable. These damages will be declared to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(4).

> (ii)    *Betty Campbell.*

The **$55,000.00** in transfers to Betty Campbell are identifiable damages flowing from the Defendant's violation of the *Bullock* standard as discussed above. The Court finds these damages to be non-dischargeable under Section 523(a)(4) of the Code.

34

### III.    The Plaintiffs' Attorney's Fees.

The Plaintiffs were awarded $238,990.50 in attorney's fees in the West Virginia action, which the jury included in the overall damages award of $2,356,289.09. Pl. Ex. 94, 95; Def. Ex. 1. Subtracting the $238,990.50 in legal fees from the gross award of $2,356,289.09 means that the jury awarded the Plaintiffs $2,117,298.59 in damages before the award of attorney's fees. The Court in this action holds a total of $221,195.18 in damages to be non-dischargeable under Counts I and II (there is no overlap between the damages on the two Counts), or 10% of the award in West Virginia excluding the attorney's fees. Generally, an award of attorney's fees follows the non-dischargeable nature of the award. *See In re Uzaldin,* 418 B.R. 166, 172 (Bankr. E.D. Va. 2009) (non-dischargeable domestic support obligation) (citing *Silansky v. Brodsky, Greenblatt & Renehan (In re Silansky),* 897 F.2d 743 (4th Cir. 1990)).

The Court, therefore, holds 10% of the attorney's fees awarded in the West Virginia action, or **$23,899.05,** to be non-dischargeable under Sections 523(a)(2)(A) and 523(a)(4) of the Code.

### Conclusion

For the foregoing reasons, the Court will enter a separate Order under which:

A.    Under Count I, the Court will declare the Plaintiffs' Judgment to be non-dischargeable with respect to the **$150,000.00** and any pre-judgment and post-judgment interest on that amount allowable under West Virginia law to be non-dischargeable under Section 523(a)(2)(A). The Court will enter judgment for the Defendant on the balance of the Plaintiffs' claims under Count I.

B.    Under Count II, the Court will declare the **$16,195.18** in vehicle expenses, and the **$55,000.00** paid to Ms. Campbell and any pre-judgment and post-judgment interest on

35

those amounts allowable under West Virginia law to be non-dischargeable under Section

523(a)(4). The Court will enter judgment for the Defendant on the balance of the Plaintiffs'

claims under Count II.

    C.  The Court finds that **$23,899.05** of the Plaintiffs' attorney's fees from the

West Virginia action to be non-dischargeable under Sections 523(a)(2)(A) and (a)(4) of the

Code.

    D.  In sum, the Court finds total amount of the Plaintiffs' Judgment to be non-

dischargeable is **$245,094.23**, plus any pre-judgment and post-judgment interest allowable under

West Virginia law.

    E.  The Clerk will mail copies of these Findings of Fact and Conclusions of

Law and the accompanying Order to the parties below, or will provide counsel with cm-ecf

notice of their entry.

Date: _Nov 28 2016_____   /s/ Brian F. Kenney_____
                Brian F. Kenney
Alexandria, Virginia      United States Bankruptcy Judge


Copies to:          Entered on Docket: Nov 28 2016 mjr

Britteny N. Jenkins, Esquire
Spilman Thomas & Battle, PLLC
310 First Street, Suite 1100
Roanoke, VA 24011
*Counsel for Plaintiffs*

Frank Bredimus, Esquire
Law Office of Frank Bredimus
16960 Ivandale Rd.
Hamilton, VA 20158
*Counsel for Defendant*